**Slip Op. 24-46**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

| **Court No. 22-00092** | **Court No. 22-00125** |
|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant*, <br><br> and <br><br> CATFISH FARMERS OF AMERICA and eight of its individual members, <br><br> *Defendant-Intervenors*. | CATFISH FARMERS OF AMERICA and eight of its individual members, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant*, <br><br> and <br><br> NAM VIET CORPORATION, NTSF SEAFOODS JOINT STOCK COMPANY, and GREEN FARMS SEAFOOD JOINT STOCK COMPANY, <br><br> *Defendant-Intervenors*. |

Before: M. Miller Baker, Judge

## OPINION

[In both cases, the court remands to Commerce for further proceedings.]

Dated: April 17, 2024

*Robert L. LaFrankie*, Crowell & Moring LLP of Washington, DC, on the briefs for Green Farms Seafood Joint Stock Company.

*Nazak Nikakhtar*, *Maureen E. Thorson*, and *Stephanie M. Bell*, Wiley Rein LLP of Washington, DC, on the briefs for Catfish Farmers of America and its members.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Kara M. Westercamp*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for the United States. Of counsel for the United States was *Hendricks Valenzuela*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

*Robert G. Gosselink* and *Jonathan M. Freed*, Trade Pacific PLLC of Washington, DC, on the brief for NTSF Seafoods Joint Stock Company.

*Matthew McConkey*, Mayer Brown LLP of Washington, DC, on the brief for Nam Viet Corporation.

*Baker*, Judge: These overlapping cases arise out of the Department of Commerce's 17th administrative review of its antidumping order on catfish imports from Vietnam. In Case 22-92, Green Farms Seafood Joint Stock Company—a Vietnamese fish producer

and exporter—argues that its tariff is too high. In Case 22-125, Catfish Farmers of America and several of its constituent members contend that the tariff assigned to another exporter—and by extension to Green Farms—is too low. The government, caught in a crossfire in this latest skirmish in the enduring Twenty Years' Catfish War, asserts the Department reached the Goldilocks solution—just right. For the reasons explained below, the court sends both cases back to the agency's drawing board.

I

In 2003, Commerce imposed an antidumping duty order on catfish from Vietnam. *See Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 47,909 (Dep't Commerce Aug. 12, 2003). Because Vietnam has a nonmarket economy, the order mandated specific tariffs on entities that demonstrated independence from the government and otherwise applied a single country-wide rate. *See id.* at 47,909–10.[1] The order has undergone many administrative reviews; the one here covered August 1, 2019, through July 31, 2020. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 63,081, 63,084–85 (Dep't Commerce Oct. 6, 2020).

---

[1] For the statutory and regulatory background, *see Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334–41 (CIT 2020) (addressing issues from 14th review).

In that review, Commerce found that three companies demonstrated independence from the Vietnamese government and thus were eligible for separate rates: NTSF Seafoods Joint Stock Company, East Sea Seafoods Joint Stock Company, and Green Farms. Appx1037. All other producers received the country-wide rate of $2.39 per kilogram. Appx1094.

As mandatory respondents, NTSF and East Sea were each individually investigated. Based on a comparison of the former's reported data to costs of producing fish in India—the surrogate market-economy country chosen by Commerce over the objections of Catfish Farmers—the Department found that NTSF did not dump its catfish in the U.S. market and thus assigned the company a zero margin. Appx1093.

East Sea, on the other hand, ceased cooperating with the review after establishing its eligibility for a separate rate, prompting Commerce to apply facts otherwise available with an adverse inference. *Id.* That resulted in the agency assigning the company a margin of $3.87 per kilogram. *Id.*

Finally, because Green Farms was not individually investigated, the Department determined that company's rate by averaging NTSF's and East Sea's margins, even though Green Farms contended that the latter should be excluded from the calculation. Appx1069–1070. The consequence was that the agency assigned Green Farms a tariff of $1.94 per kilogram. Appx1070.

II

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), Green Farms and Catfish Farmers both sued under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) to challenge Commerce's final determination. Case 22-92, ECF 9 (complaint); Case 22-125, ECF 9 (complaint). Each then intervened in the other case on the side of the government. Case 22-92, ECF 16; Case 22-125, ECF 30. Nam Viet Corporation and NTSF also intervened in Catfish Farmers' case to support the government. Case 22-125, ECF 20, 25.

After the court consolidated the cases for briefing, the plaintiffs moved for judgment on the agency record. Case 22-92, ECF 39; Case 22-125, ECF 49. The government opposed, Case 22-92, ECF 44; Case 22-125, ECF 54, as did the intervenors, Case 22-92, ECF 38; Case 22-125, ECF 51. The plaintiffs replied. Case 22-92, ECF 40; Case 22-125, ECF 50. The court decides the motions on the papers.

In § 1516a(a)(2) actions such as these, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

In addition, the Department's exercise of discretion in § 1516a(a)(2) cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in § 1516a cases brought under section 516A of the Tariff Act of 1930, APA "section 706 review applies since no law provides otherwise") (citing 28 U.S.C. § 2640(b)).

## III

In Case 22-92, Green Farms raises two overarching issues. First, it challenges Commerce's determination

that East Sea is eligible for a separate rate.[2] Second, it asserts that even if East Sea is so eligible, the latter's adverse-inference tariff should not affect the calculation of Green Farms's margin.

## A

Green Farms maintains that the Department's grant of a separate rate to East Sea is both contrary to law, ECF 39, at 15–32, and unsupported by sub-

---

[2] Green Farms assumes that if Commerce denies East Sea a separate rate on remand, the Department will then calculate Green Farms's margin using NTSF's zero tariff, either alone or in conjunction with calculated separate rates in preceding administrative reviews. *See* ECF 39, at 51–52; ECF 40, at 29–31. Catfish Farmers contest this assumption, arguing that in this scenario Commerce would assign the country-wide rate of $2.39 per kilogram to East Sea and use only that to calculate Green Farms's tariff. *See* ECF 38, at 22–25. If that's right, Green Farms would then be worse off, as its current margin is only $1.94/kilogram.

Because the court reviews, not prophesies, agency action, *cf*. *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) ("[T]his is a court of final review and not first view . . . .") (quoting *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 399 (1996) (Ginsburg, J., concurring in part and dissenting in part)), it need not consider this hypothetical question now. If on remand the Department finds East Sea ineligible for a separate rate, Commerce can address this dispute in the first instance, and any dissatisfied party can then seek relief here.

stantial evidence, *id.* at 33–39. The court considers those questions in turn.

1

Green Farms contends that Commerce has a "written policy" requiring separate-rate applicants to respond to "'*all* parts of the questionnaire as mandatory respondents' to remain eligible for separate rate status." ECF 39, at 21 (emphasis in original) (quoting Appx7674). The company contends that "[t]he policy is clear. 'All' means 'all.' East Sea failed to answer 'all' parts of the questionnaire it received as a mandatory respondent. Therefore, under Commerce's written policy, it can 'no longer be eligible for separate rate status.'" *Id.* (quoting Appx7674).

The government responds that independence from government control is a separate question from analysis of sales and cost data. ECF 44, at 49 (quoting Appx1061 and citing *Nat'l Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1377 (CIT 2018)). The court agrees. "This Court has consistently held that it is unreasonable for Commerce to impute the unreliability of a company's questionnaire responses and submissions concerning its factors of production and/or U.S. sales to its separate-rate responses when there is no evidence on the record indicating that the latter were false, incomplete, or otherwise deficient." *Yantai Xinke Steel Structure Co. v. United States*, 36 CIT 1035, 1054 (2012), *superseded by statute on other grounds,* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27,

§ 502, 129 Stat. 362, 383–84 (2015), *as recognized in Deosen Biochem. Ltd. v. United States*, 307 F. Supp. 3d 1364, 1372 (CIT 2018).

Moreover, even if the Department has the policy that Green Farms ascribes to it, an agency can deviate from its practices if it "show[s] that there are good reasons" for doing so. *Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009). As the government argues, "Commerce provided both notice and explanation for why it granted [East Sea] a separate rate." ECF 44, at 50 (citing Appx1010–1011, Appx1060–1064).

The Department reasoned that because the Vietnam-wide margin is lower than the adverse-inference tariff, denying East Sea a separate rate would benefit the uncooperative company and allow respondents to manipulate the investigation. Appx1062. The agency noted that the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act[3] allows for an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."

---

[3] *See* H.R. Doc. No. 103–316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040. Congress declared the SAA "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

*Id.* (quoting SAA, H.R. Doc. 103–316, at 870). Complying with the SAA and preventing respondents from benefiting from a lack of cooperation are valid reasons for a change in practice, if that's what happened here. The court therefore rejects Green Farms's argument that Commerce erred as a matter of law in granting East Sea a separate rate.

2

Green Farms also contends that substantial evidence does not support the Department's finding that East Sea is eligible for a separate rate. ECF 39, at 33–39. The company advances three arguments.

First, Green Farms asserts that East Sea's separate-rate certification was deficient and did not include sufficient information to establish eligibility, and it also contends that it was improper in any event for East Sea to submit a "certification" instead of the longer-form "application."[4] ECF 39, at 33–35. The court need not address these points because Commerce did not rely on the certification. Rather, the Department noted that East Sea had also submitted a response to Section A of the mandatory-respondent

---

[4] The certification is a streamlined renewal form used by companies that recently received separate rates, while the application is for companies seeking such relief for the first time or that lost a separate rate previously received. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 63,081, 63,082 & n.3 (Dep't Commerce Oct. 6, 2020) (explaining process).

questionnaire that, taken together with the material submitted in the certification, established eligibility. Appx1011; Appx1061; *see also* Appx1061 n.175 (noting Green Farms's argument and stating that "it was unnecessary to require [East Sea] to remedy this deficiency because Commerce solicited extensive, similar information in its Section A questionnaire").

Second, the company maintains that the Department disregarded *Catfish Farmers*' comments about alleged deficiencies in East Sea's certification. ECF 39, at 33–35. Catfish Farmers themselves make no such argument, instead urging the court to sustain East Sea's separate rate. The government, meanwhile, notes that Catfish Farmers submitted the comments in question before Commerce issued its preliminary determination. ECF 44, at 53.

The final determination, in turn, makes clear that Catfish Farmers proffered no objection to the Department's preliminary conclusions. Appx1059–1060. In other words, Catfish Farmers abandoned their arguments. After the agency issues its preliminary determination, the parties have 50 days to file case briefs that "must present all arguments that continue in the submitter's view to be relevant to the Secretary's determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." 19 C.F.R. § 351.309(c)(2). "Both Commerce and reviewing courts normally find an argument not presented in a party's

case brief to be waived unless the argument could not have been raised in the case brief." *NTSF Seafoods Joint Stock Co. v. United States*, Ct. Nos. 20-00104, 20-00105, Slip Op. 22-38, at 24, 2022 WL 1375140, at \*8 (CIT Apr. 25, 2022).

Because Catfish Farmers elected not to include their pre-preliminary arguments in their case brief, Green Farms needed to assert them. It failed to do so; instead, it now complains that "Commerce does not even mention CFA's deficiency comments, much less consider them." ECF 39, at 35. But that is what ordinarily happens when a party abandons its arguments: The Department reasonably chose not to address Catfish Farmers' forsaken comments when Green Farms declined to adopt them as its own.

Finally, Green Farms contends that Commerce did not "adequately explain[ ] its decision, or how the evidence supports its findings under each of the factors relevant to determining the absence of both '*de jure*' and '*de facto*' control." *Id.* at 37. The court agrees.

In its preliminary determination, the Department simply said that East Sea's evidence "supports a preliminary finding that [it] is eligible for a separate rate" and that it "provided an adequate response to Commerce's questionnaire as it related to the company's independence from the Vietnamese Government and separate rate eligibility." Appx1011. The agency further identified the relevant factors it considers in examining *de jure* and *de facto* independence, but in

finding those factors satisfied it merely repeated the factors themselves and gave blanket citations to the company's separate-rate certification. Appx1010–1011 & nn.63, 66.[5] Merely reciting the legal standard, without analysis, is not substantial evidence. *Ninestar Corp. v. United States*, Ct. No. 23-00182, Slip Op. 24-24, at 28, 2024 WL 864369, at *13 (CIT Feb. 27, 2024) (citing *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.")).

The final determination, in turn, simply listed the broad categories of information East Sea provided and then concluded, "We found no basis to determine that the separate-rate information submitted was not reliable." Appx1061. Later, Commerce repeated that East Sea "did provide sufficient information necessary to determine its independence from the Government of Vietnam." Appx1063. The final determination contained no analysis of its own—rather, it said that the Department "continue[d] to find" that East Sea had established a right to a separate rate. Appx1060. But Commerce's preliminary discussion was conclusory.

In layman's terms, the Department didn't show its work, and the requirement that it do so is "a 'basic

---

[5] The referenced footnotes merely cite "NTSF SRC; ESS SRC; and Green Farms SRA." Neither refers to specific pages or material.

principle' in administrative law that is 'indispensable to sound judicial review.'" *Ninestar*, Slip Op. 24-24, at 28, 2024 WL 864369, at \*13 (quoting *Amerijet Int'l, Inc. v. Pistole*, 743 F.3d 1343, 1350 (D.C. Cir. 2014)). The court therefore remands to provide Commerce with the opportunity to "offer a fuller explanation of the agency's reasoning at the time of the agency action." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (cleaned up).

B

Green Farms alternatively asserts that even if Commerce properly granted East Sea a separate rate, the Department nonetheless erred by using it to calculate Green Farms's tariff. ECF 39, at 39–53. The company contends that East Sea's adverse-inference rate is not reasonably reflective of economic reality or Green Farms's potential dumping margins. *Id.* at 39–43.

Commerce observed that the statute instructs the agency to ordinarily disregard any rates that are zero, *de minimis*, or based entirely on facts available when setting a separate rate for companies not individually examined, such as Green Farms. Appx1011 (citing 19 U.S.C. § 1673d(c)(5)(A)).[6] Here, however, the tariffs for

---

[6] Neither the Tariff Act nor Commerce's regulations address how the Department should establish the separate rate for companies not individually examined in an antidumping investigation or administrative review of imports

the only companies individually examined—NTSF's zero margin and East Sea's adverse-inference rate—fell within those "disregard" categories. Appx1011. The Department noted that in such situations, it "may use 'any reasonable method' for assigning the rate to all other respondents, including 'averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.'" *Id.* (quoting 19 U.S.C. § 1673d(c)(5)(B)). Commerce therefore preliminarily calculated Green Farms's rate by taking the simple average[7] of NTSF's and East Sea's margins. *Id.*

Green Farms argued that the Department should disregard East Sea's margin in that calculation because the agency's "normal practice" is to exclude adverse-inference rates. Appx1067. Instead, Green Farms urged Commerce to simply assign it NTSF's zero margin. *Id.* The company also contended that the inclusion of an adverse-inference rate meant the

---

from a nonmarket-economy country. In such cases, agency practice is to use the statutory method for determining an "all-others" rate in market-economy cases. *See Am. Mfrs. of Multilayered Wood Flooring v. United States*, Ct. No. 21-00595, Slip Op. 24-13, at 4 n.3, 2024 WL 489474, at *1 n.3 (CIT Feb. 8, 2024).

[7] Commerce explained that it used a simple average, rather than the weighted average specified in the statute, "because publicly ranged shipment data were not available for" East Sea. Appx1069 n.222. No party challenges that aspect of the decision.

calculated margin did not "reasonably reflect" its economic reality. *Id.*

The Department found its methodology consistent with the statutory command and noted that the SAA states that "the expected method" when all individually examined respondents receive dumping margins that are zero, *de minimis*, or based entirely on facts available "will be to weight average the zero and *de minimis* margins *and margins determined pursuant to facts available*, provided that volume data is available." Appx1069 (emphasis in original). Commerce noted that the statute permits the use of other "reasonable methods" if the "expected method is not feasible," but it found the "expected method"—as modified to use a simple average—feasible here. *Id.* The Department observed that Green Farms cited no evidence to show otherwise and further found that relying solely on NTSF's rate would contradict the statutory instruction to use both mandatory respondents' margins. *Id.*

Finally, Commerce explained that the margin it assigned—$1.94/kg—"is far more similar to Green Farms' cash deposit rate during the [period of review] (*i.e.*, $1.37 per kg) than any of the rates proposed by Green Farms," so the Department found "no basis to conclude that the rate calculated in accordance with [§ 1673d(c)(5)(B)] is not appropriate." Appx1070.

The government and Catfish Farmers convincingly argue that Commerce correctly followed the statutory command and the SAA by averaging NTSF's zero rate

and East Sea's adverse-inference tariff. But that's not the end of the matter. Although the statute and the SAA *permit* Commerce to "use a simple average methodology to calculate the separate rate," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013), "'it is possible for the application of a particular methodology to be unreasonable in a given case,'" *id.* (quoting *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001)). "'Form should be disregarded for substance and the emphasis should be on economic reality.'" *Id.* (brackets omitted) (quoting *United States v. Eurodif S.A.*, 555 U.S. 305, 317–18 (2009)).

Green Farms argues, among other things, that *Bestpak* is "particularly instructive." ECF 40, at 25. The court agrees. In that case, there were likewise two mandatory respondents, only one of which cooperated. 716 F.3d at 1374. Also as here, Commerce calculated the margin for a non-investigated separate rate company, Bestpak, by averaging the cooperating respondent's zero margin with the non-cooperating respondent's adverse-inference tariff. *Id.* at 1375. The Federal Circuit remanded because the record contained no information tying this rate to "Bestpak's commercial activity." *Id.* at 1380. Assigning Bestpak half of the adverse-inference rate "with no other information [was] unjustifiably high and may amount to being punitive, which is not permitted by the statute." *Id.* at 1379.

Here, the Department's only record-based justification for assigning Green Farms a margin of $1.94/kg—half the adverse-inference rate—is its similarity to the company's cash deposit tariff during the period of review. *See* Appx1070. But as Green Farms argues, its cash deposit rate "is irrelevant," ECF 40, at 33, because "[t]he very point of the . . . review process (and separate rate application) is to afford [the company] the opportunity to update this cash deposit rate with newer and updated data . . . . Otherwise there would be no point in participating in [the] review." *Id.* The court agrees that Commerce's use of the cash deposit rate to justify Green Farms's margin is "wholly circular and arbitrary." *Id.* As in *Bestpak*, "a review of the administrative record reveals a lack of substantial evidence showing that" Green Farms's tariff "reflects economic reality." 716 F.3d at 1378.

\* \* \*

The court grants Green Farms's motion for judgment on the agency record. On remand, Commerce must reconsider East Sea's eligibility for a separate rate. Insofar as the Department reaffirms that determination, it must then reconsider the calculation of Green Farms's margin.

IV

In Case 22-125, Catfish Farmers challenge Commerce's use of India, rather than Indonesia, as the primary surrogate country to calculate NTSF's rate, and

seek that margin's recalculation; they relatedly ask the court to remand Green Farms's margin for reconsideration because it was based in part on NTSF's tariff. *See* ECF 49, at 10–36.[8]

Catfish Farmers observe that a case from the 16th administrative review involves "a substantively identical challenge to the agency's economic comparability analysis." ECF 49, at 17. They are correct. Commerce's discussion of India versus Indonesia here repeats its analysis in that case[9] and another involving the 15th review,[10] and it is deficient for the same reason as in those cases—the Department's misapplication of the statutory standard.

Despite having invited interested parties "to propose for consideration other countries [not on its 'surrogate country list'] that are at a level of economic development *comparable to* Vietnam," Appx7798

---

[8] Catfish Farmers' complaint asserts certain other claims in Counts I, II, III, and V, but their motion fails to address them. The government invokes waiver, *see* ECF 54, at 3 n.2, which Catfish Farmers do not dispute. The court therefore sustains the aspects of Commerce's decision challenged in those counts.

[9] *See Catfish Farmers of Am. v. United States*, Ct. No. 21-00380, Slip Op. 23-97, 2023 WL 4560815 (CIT July 7, 2023).

[10] *See Catfish Farmers of Am. v. United States*, Ct. No. 20-00105, Slip Op. 24-23, 2024 WL 775181 (CIT Feb. 26, 2024).

(emphasis added), Commerce asserted that it need not consider whether the Indonesian data are superior because "Indonesia is not at the *same level of economic development* as Vietnam," Appx1077 (emphasis added). But the Department never considered whether Indonesia is at a *comparable level*, as Catfish Farmers contend. That omission invalidates the analysis because, as the court has explained, Commerce may not ignore Catfish Farmers' evidence and argument. *See NTSF*, Slip Op. 22-38, at 39–40, 2022 WL 1375140, at *13 (explaining that the finding that India is economically comparable to Vietnam "is irrelevant to whether, as Catfish Farmers argued before the Department, Indonesia is *also* economically comparable") (emphasis in original).

As the court has now twice before explained, the Department's discretion does not permit it to disregard the statutory "comparable level of economic development" standard. *See* Slip Op. 23-97, at 16–18, 2023 WL 4560815, at *6; Slip Op. 24-23, at 5–6, 2024 WL 775181, at *2 (noting that because the statute requires the use of "comparable" countries, "[a] more demanding rule that excludes [them] is therefore not in accordance with law"); *see also* 19 U.S.C. § 1677b(c)(4)(A) (requiring the use of price or cost data from "one or more market economy countries that are . . . at a level of economic development *comparable* to that of the nonmarket economy country") (emphasis added). Because Catfish Farmers argue that Indonesia is economically comparable to Vietnam, on remand

Commerce must either explain why it disagrees[11] or else compare the two countries' data to assess which set is superior. Insofar as NTSF's and (by extension) Green Farms's rates are based on Indian data, Commerce must recalculate them if it selects a different primary surrogate country.[12]

*   *   *

The court grants Catfish Farmers' motion for judgment on the agency record and remands for Commerce to examine whether Indonesia is at a level of economic development comparable to Vietnam and, if so, to analyze whether India or Indonesia offers superior surrogate data. The court also directs the Department to

---

[11] The government argues, "Commerce reasonably determined that the record of this review did not demonstrate that Indonesia was at a level of economic development comparable to Vietnam, regardless of surrogate country decisions in past segments of this order." ECF 54, at 30. That statement mischaracterizes what the Department did. Commerce made no finding about Indonesia's economic comparability to Vietnam—instead, the agency simply claimed that because the former country is not on the "surrogate country list," it is not at the *same* level, without reference to whether it might still be *comparable*. Appx1077; *cf.* Slip Op. 24-23, at 5, 2024 WL 775181, at *2 (noting that "comparable" is "broader" than "same" because "it includes the merely similar as well as the identical").

[12] While Catfish Farmers raise other challenges to specific aspects of the Indian data Commerce used, it is unnecessary to address them in view of the court's direction that the Department reconsider its surrogate country selection.

reconsider NTSF's tariff because it is based on Indian data. If that reconsideration results in a change to that company's margin, Commerce must then reconsider Green Farms's rate.

Dated:  April 17, 2024      /s/ *M. Miller Baker*
        New York, NY      M. Miller Baker, Judge