Slip Op. 25-109

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KUMHO TIRE (VIETNAM) CO., LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,**<br><br>Defendant-Intervenor. | **Before: Timothy M. Reif, Judge**<br><br>**Court No. 21-00397** |

## OPINION

[Sustaining the remand results of the U.S. Department of Commerce in the countervailing duty investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam.]

Dated: August 22, 2025

Jeffrey M. Winton, Winton & Chapman PLLC, of Washington, D.C., argued for plaintiff Kumho Tire (Vietnam) Co., Ltd. With him on the briefs were Michael J. Chapman, Amrietha Nellan, and Vi N. Mai.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. With her on the brief were Yaakov M. Roth, Acting Assistant Attorney General and Patricia M. McCarthy, Director. Of counsel on the brief was Paul H. Thornton, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of

Commerce, of Washington, D.C.

<u>Elizabeth J. Drake</u>, Schagrin Associates, of Washington, D.C., argued for defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.  With her on the brief were <u>Roger B. Schagrin</u> and <u>Saad Y. Chalchal</u>.

Reif, Judge:  Before the court are the remand results of the U.S. Department of Commerce ("Commerce") concerning the countervailing duty ("CVD") investigation of passenger vehicle and light truck ("PVLT") tires from Vietnam.  Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 91-1; *see also Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination* ("*Final Determination*"), 86 Fed. Reg. 28,566 (Dep't of Commerce May 27, 2021).  Plaintiff Kumho Tire (Vietnam) Co., Ltd. ("plaintiff") opposes certain aspects of the Remand Results and requests that the court remand to Commerce for reconsideration.  Defendant United States ("defendant") and defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("defendant-intervenor") assert that Commerce's Remand Results are supported by substantial evidence and are otherwise in accordance with law.

The court sustains Commerce's Remand Results, as described below.

## BACKGROUND

The court assumes familiarity with the facts of the instant case and recounts only what is necessary to resolve the issues before the court on remand.

In 2020, Commerce promulgated a new regulation, 19 C.F.R. § 351.528, which established the process for Commerce to determine whether a foreign country's undervaluation of its currency constitutes a countervailable subsidy.  *See Modification of*

*Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*

("*Final Rule*"), 85 Fed. Reg. 6,031 (Dep't of Commerce Feb. 4, 2020).  Commerce also

modified existing regulation 19 C.F.R. § 351.502 to add new subparagraph (c), "which

explains that enterprises that buy or sell goods internationally . . . can comprise a

'group' of enterprises for specificity purposes."[1]  *Id.*

On May 27, 2021, Commerce issued its *Final Determination*, in which Commerce

concluded that countervailable subsidies were being provided to producers of PVLT

tires from Vietnam.  *Final Determination*, 86 Fed. Reg. at 28,566.  Commerce found that

Vietnamese producers of PVLT tires benefited from a number of subsidy programs.

Issues and Decision Memorandum for the Final Determination in the Countervailing

Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist

Republic of Vietnam (May 21, 2021) ("IDM") at 3-4, PR 468.

In the *Final Determination*, Commerce concluded that plaintiff's exchanges of

U.S. dollars ("USD") for Vietnamese dong ("VND") with Vietnamese banks constituted

countervailable subsidies.  IDM at 4; Preliminary Decision Memorandum (Oct. 30, 2020)

("PDM") at 24-25, PR 296.  In reaching that determination, Commerce examined

whether the currency undervaluation program of the Government of Vietnam ("GOV")

---

[1] As described below, plaintiff alleges that the currency undervaluation program of the Government of Vietnam is "not 'Specific' under the Statute."  Motion of Pl. Kumho Tire (Vietnam) Co., Ltd. for J. on the Agency R. ("Pl. Br.") at 40, ECF No. 30.  Plaintiff has not challenged Commerce's modification of 19 C.F.R. § 351.502(c) to "consider enterprises that buy or sell goods internationally to comprise . . . a group" as inconsistent with 19 U.S.C. § 1677(5A)(D).

was *de facto* specific under section 771(5A)(D) of the Tariff Act of 1930, 19 U.S.C. § 1677(5A)(D).[2]  PDM at 23.

Commerce concluded in reliance on § 351.502(c) that "companies that buy or sell goods internationally" — referred to as the "traded goods sector" — "comprise a group . . . within the meaning of section 771(5A)(D)(iii)(II)" of the CVD law.  *Kumho Tire (Vietnam) Co., Ltd. v. United States* ("*Kumho I*"), 48 CIT __, __, 741 F. Supp. 3d 1277, 1325 (2024) (quoting IDM at 20); IDM at 19-20 (citing 19 C.F.R. § 351.502(c)). Commerce then proceeded according to 19 U.S.C. § 1677(5A)(D)(iii)(II) to assess whether the traded goods sector "group" was a "predominant user of the subsidy."  *Id.* In making that assessment, Commerce sought to compare the amount of USD converted into VND during the period of investigation ("POI") by exporters in Vietnam — the numerator — to the total amount of USD converted to VND by all entities in Vietnam — the denominator.  *Id.*

To that end, Commerce requested from the GOV "total USD inflow from the traded goods sector, and how much came from . . . the traded services sector and . . . utilized FDI and inbound portfolio investment."[3]  *Id.* at __, 741 F. Supp. 3d at 1326 (internal quotation marks omitted) (quoting PDM at 23).  Commerce sought specifically "actual figures representing the share of total USD inflow which was converted into local currency" and "the share of these conversions attributable to the traded goods sector."

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

[3] "FDI" refers to "foreign direct investment."

GOV's Second Supplemental Questionnaire Response (Oct. 13, 2020) ("GOV SQR2") at 4, PR 272-273.

The GOV did not provide the information as requested by Commerce because the State Bank of Vietnam does not collect data of USD capital inflows or USD trading by field and by sector, and "does not maintain the total value of USD inflow converted into VND."[4]  *Id.* at 4-5; IDM at 18.  Instead of providing the requested information, the GOV provided the "total USD inflow in several categories including net commodity trade, One-way money transfers of the net private sector, FDI in Vietnam, PI in Vietnam and Net Foreign debt."[5]  GOV's Third Supplemental Questionnaire Response (Oct. 19, 2020) ("GOV SQR3"), PR 287 (internal quotation marks omitted); *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1326.  Because the GOV declined to provide Commerce with the requested data concerning actual currency conversions in Vietnam, Commerce relied on data from the International Monetary Fund ("IMF") for USD inflows to Vietnam as a proxy for currency conversions.[6]  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1326; PDM at 23-24; *see* IMF/OECF Mem. (Oct. 8, 2020) at attach. 1, PR 254.  Commerce determined that "the universe of annual currency conversions would be comprised of 'four major channels of exchange: (a) exports of goods, (b) exports of services, (c)

---

[4] During the investigation the GOV reported that the State Bank of Vietnam "is the main authority handling foreign exchange activities in Vietnam."  PDM at 20.

[5] "PI" refers to "portfolio investment."

[6] The IMF data "reflects data submitted by the State Bank of Vietnam to the IMF."  PDM at 23.

various forms of portfolio and direct investment, and (d) earned income from abroad.'"

*Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1325 (quoting PDM at 23-24).

After dividing the USD inflows to Vietnam from the traded goods sector — i.e.,

the export of goods — by total USD inflows to Vietnam, Commerce found that 71.94

percent of USD inflows to Vietnam during the POI came from the export of goods.  PDM

at 24.  As a result, Commerce concluded that "enterprises that buy or sell goods

internationally are the predominant users of the GOV's currency undervaluation subsidy,

and, therefore, th[e] program is *de facto* specific under" 19 U.S.C. § 1677(5A)(D)(iii)(II).[7]

*Id.*

Commerce then examined whether the currency undervaluation subsidy

conferred a benefit as required by 19 U.S.C. § 1677(5)(B) and (E).  PDM at 24.  For the

benefit analysis, Commerce relied on 19 C.F.R. § 351.528, which provides that a benefit

is conferred from the exchange of USD for the currency of a country under review or

investigation "only if that country's currency is undervalued during the relevant period."

19 C.F.R. § 351.528(a)(1); PDM at 24.  To determine whether a country's currency is

undervalued, Commerce "normally will take into account the gap between the country's

---

[7] "To add precision to the amount of USD inflows received from Vietnam's exports of goods," Commerce "discounted Vietnam's exports of goods value by the amount of intermediary imported goods (based on OECD estimates) to arrive at a reasonable estimate of exports that earned foreign exchange."  PDM at 24; IDM at 18-19 (stating that Commerce "discounted Vietnam's exports of goods by the amount of intermediary goods inputs" to "account for USD inflows which may not have resulted in currency conversion").  Commerce found that the record demonstrated "that 71.94 percent of USD inflows into Vietnam were accounted for by companies that sell goods internationally adjusted to account for the impact of intermediary imported goods; including companies that primarily buy goods internationally in this analysis would not substantially change this percentage, because they do not bring USD into Vietnam." IDM at 19.

real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term that reflects appropriate policies (equilibrium REER)."  19 C.F.R. § 351.528(a)(1); PDM at 24.  19 C.F.R. § 351.528(c) directs that Commerce "will request that the Secretary of the Treasury provide its evaluation and conclusion as to" whether and to what extent a country's currency is undervalued.

The U.S. Department of Treasury ("Treasury") reported that the VND was undervalued based on the GOV's actions during the POI because there was a gap between the VND's REER and its equilibrium REER.  Letter from Treasury to Commerce (Aug. 24, 2020) ("Treasury Report") at 1, PR 165; PDM at 24.  Treasury assessed that the GOV's "net purchases of foreign exchange . . . totaling $22 billion. . . . had the effect of undervaluing the dong vis-à-vis the U.S. dollar by 4.7%."  Treasury Report at 1-2; PDM at 24.

In measuring the benefit provided to respondents by reason of the undervalued VND, Commerce "calculated 'the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency the firm would have received absent the difference'" between the VND's REER and its equilibrium REER by applying the 4.7 percent undervaluation to "each currency exchange transaction" reported by the respondents.  PDM at 25.  For each respondent, Commerce then "aggregated the total benefits in USD based on the sum of these individual transactions during the POI."  *Id.* (citing USD Inflow Calculation Mem. (Nov. 4, 2020), PR 303).  Commerce determined that plaintiff received a currency undervaluation subsidy of 1.69 percent ad valorem.  *Id.*; IDM at 4.

Plaintiff, one of two mandatory respondents in the underlying CVD investigation, challenged Commerce's finding with respect to two subsidy programs. *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1289-90. Plaintiff challenged specifically certain aspects of Commerce's decision to treat as countervailable subsidies: (1) plaintiff's acquisition of land-use rights for less than adequate remuneration and (2) the currency undervaluation program of the GOV. *Id.* Among other arguments, plaintiff asserted that currency undervaluation is not specific and therefore is not countervailable as a subsidy under the U.S. CVD law. *Id.* at __, 741 F. Supp. 3d at 1328-36. Plaintiff argued also that Commerce's determination that the VND was undervalued during the POI — which established the existence of a benefit conferred on plaintiff as required under § 1677(5)(B) — was unsupported by substantial evidence. *Id.* at __, 741 F. Supp. 3d at 1336; *see also* 19 C.F.R. § 351.528(b)(1).

On October 18, 2024, this Court sustained in part and remanded in part Commerce's *Final Determination*. *Kumho I*, 48 CIT at __, F. Supp. 3d at 1286. The Court concluded first that Commerce's decision to countervail plaintiff's land-use rights for less than adequate remuneration was supported by substantial evidence and in accordance with law. *Id.* at __, 741 F. Supp. 3d at 1291-94. Then, with respect to Commerce's decision to countervail the GOV's currency undervaluation program, the Court held that "U.S. CVD law provides the authority for Commerce to promulgate its regulations in 2020 and to apply them [to countervail currency undervaluation] in investigations and reviews." *Id.* at __, 741 F. Supp. 3d at 1318. However, the Court remanded for further explanation certain aspects of Commerce's conclusion that the

GOV's currency undervaluation program was specific and conferred a benefit to plaintiff as required under 19 U.S.C. § 1677(5)(A)-(B). *Id.* at __, 741 F. Supp. 3d at 1353.

To start, the Court ordered that on remand Commerce "state clearly the statutory authority under which it relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions." *Id.* Then, the Court ordered that Commerce provide a more thorough explanation of its specificity analysis, stating:

> [O]n remand Commerce [is to] provide as to its specificity analysis (1) a clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the GOV to provide total USD inflows from the traded goods sector, the traded services sector and utilized FDI and inbound portfolio investment; and (2) the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis. Specifically with respect to (2), Commerce is to provide: (a) specific reasons that Commerce did not use the GOV's third supplemental questionnaire response and whether that response met Commerce's request in its questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii) explain "what went into [those] calculations"; and (iii) "report all original values requested"; and (b) specific reasons that Commerce did not accept the six elements of data that GOV provided to comprise total USD inflows and whether those data relate to Commerce's use of the four major channels of exchange to comprise an economy wide surrogate number for currency conversions.

*Id.* (second alteration in original).

The Court added that Commerce failed to provide the reasons that "the four major channels of exchange" constituted "the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI." *Id.* As a consequence, the Court directed Commerce to:

> (1) explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI; (2) explain how, precisely, Commerce utilized "the information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF" to derive the four channels analysis; (3) explain what data were not provided in connection with Commerce's development of that analysis; and (4)

explain why, together, these elements prevented Commerce from using those data in its four channels analysis.

*Id.*

Finally with respect to Commerce's specificity analysis, the Court ordered that Commerce "specify whether Commerce made the assumption in its specificity determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector." *Id.*

In *Kumho I*, the Court sustained most of Commerce's finding that the GOV's currency undervaluation program conferred a benefit on plaintiff. *Id.* at __, 741 F. Supp. 3d at 1343 ("Accordingly, Commerce's determination that there was a 4.7 percent undervaluation of the Vietnamese *dong* against the U.S. dollar during the POI is adequately explained and supported by substantial evidence."). However, the Court agreed with plaintiff that there was a discrepancy in the value of that benefit as calculated in two separate reports from Treasury on the record — a discrepancy that Commerce failed to explain. *Id.* at __, 741 F. Supp. 3d at 1347; Pl. Br. at 33 n.87. Specifically, the Treasury Report that Commerce requested under § 351.528(c) for the benefit analysis in the instant CVD investigation concluded that the State Bank of Vietnam "undertook net purchases of foreign exchange in 2019 totaling about $22 billion." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1347; Treasury Report at 1. By contrast, a separate report — Treasury's January 2020 Foreign Exchange Report to Congress ("January 2020 Report") — indicated that the value of net purchases of foreign exchange for a partially overlapping time period equated to approximately $2.1

billion.[8]  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1347.  Therefore, the Court ordered

that on remand Commerce "provide a more clear and thorough explanation of the size

of the discrepancy in net purchases in foreign exchange between the Treasury Report

and the Treasury's January 2020 Report, including how the six-month non-overlapping

period could have accounted for the discrepancy."  *Id.* at __, 741 F. Supp. 3d at 1353.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. §

1581(c).  19 U.S.C. § 1516a(b)(1)(B)(i) provides that the court will hold unlawful any

determination, finding or conclusion found "to be unsupported by substantial evidence

on the record, or otherwise not in accordance with law*." See also SMA Surfaces, Inc. v.*

*United States*, 47 CIT __, __, 658 F. Supp. 3d 1325, 1328 (2023) (reviewing

Commerce's remand redetermination under § 1516a(b)(1)(B)(i)).  The court reviews

Commerce's redetermination also for compliance with the court's remand order.

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 42 CIT __, __, 331 F. Supp. 3d

1390, 1402 (2018), *aff'd*, 779 F. App'x 744 (Fed. Cir. 2019).

Substantial evidence constitutes "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion," but it requires "more than a mere

scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol.*

*Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

For a reviewing court to "fulfill [its] obligation" to determine whether a

determination of Commerce is supported by substantial evidence and in accordance

---

[8] Plaintiff submitted to the record the January 2020 Report.  KTV's September 8, 2020, Submission, attach. 17, CR 76, PR 202.

with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)). Even so, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

### LEGAL FRAMEWORK

Commerce will impose a countervailing duty when: (1) Commerce "determines that the government of a country or any public entity within the territory of a country" has subsidized the "manufacture, production, or export of" imported merchandise; and (2) the U.S. International Trade Commission determines that a U.S. industry has been "materially injured" or "threatened with material injury" or "the establishment of a[] [U.S.] industry" is "materially retarded" due to the subsidized imports. 19 U.S.C. § 1671(a)(1)-(2).

A subsidy is countervailable when "an authority . . . provides a financial contribution" that confers a benefit to a specific enterprise, industry, or group of enterprises or industries. *Id.* § 1677(5)(B), (5A). Commerce will treat a benefit as conferred, "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration." *Id.* § 1677(5)(E)(iv). Commerce will

make its determination with reference to the "prevailing market conditions," including "price, quality, availability, marketability, transportation[] and other conditions of purchase or sale." *Id.* § 1677(5)(E).

A countervailable subsidy is required to be specific as a matter of law (*de jure* specificity) or specific as a matter of fact (*de facto* specificity). A countervailable subsidy is "specific as a matter of fact" where "one or more of the following factors exist":

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

*Id.* § 1677(5A)(D)(iii).

Section 1677(5A) provides that "any reference to an enterprise or industry" in § 1677(5A) "is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."

Finally, 19 C.F.R. § 351.502(c) states that "[i]n determining whether a subsidy is being provided to a 'group' of enterprises or industries" under § 1677(5A)(D), "the Secretary normally will consider enterprises that buy or sell goods internationally to comprise such a group."

**DISCUSSION**

**I.    Commerce's specificity finding**

The court addresses first Commerce's Remand Results on the issue of the specificity of the currency undervaluation subsidy before turning to Commerce's benefit analysis.

   **A.    The statutory authority under which Commerce relied on USD inflows to Vietnam as a proxy for currency conversions**

The Court remanded for Commerce "to state clearly" the statutory authority under which it relied for its decision to use available data for USD inflows to Vietnam as a proxy for USD currency conversions. *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1353.

The court concludes that Commerce explained adequately the statutory authority on which it relied for its decision to use USD inflows to Vietnam as a proxy for currency conversions.

In the Remand Results, Commerce explained that there were "two issues" underlying Commerce's calculation that led to the conclusion that the traded goods sector is the predominant user of the currency undervaluation subsidy: (1) Commerce's use of USD inflows as a proxy for USD conversions in Vietnam; and (2) Commerce's use of the IMF data in place of information submitted by the GOV in its questionnaire responses during the investigation.  Remand Results at 6.

As to Commerce's use of USD inflows as a proxy for USD conversions in Vietnam, Commerce stated that its "statutory authority was [19 U.S.C. § 1677e(a)(1)], which states that if 'necessary information is not available on the record,' Commerce may rely on the facts otherwise available to reach a determination."  *Id.* at 7. Commerce stated that:

> ideally [it] would use data regarding conversions of USD into local currency for its specificity analysis. . . .  The specificity analysis should compare the exchanges or conversions done by a particular enterprise or industry or group of enterprises or industries — in this case, exporters in Vietnam — with the total amount of exchanges or conversions in Vietnam.

*Id.*  However, because "the GOV reported that it does not maintain information on total currency conversions in Vietnam or conversions by the traded goods sector," and because this information did not exist elsewhere in the record, Commerce instead used "data on USD denominated inflows to Vietnam."  *Id.* (citing GOV SQR2 at 4).

Commerce then turned to the statutory authority for its use of IMF data for those USD denominated inflows to Vietnam in the place of the data that the GOV reported in its questionnaire responses.  *Id.* at 8.  Commerce asserted that it relied on § 1677e(a)(2)(A) or, alternatively, § 1677e(a)(2)(B).[9]  *Id.*

Commerce explained that "[i]n the absence of data pertaining to USD conversions by exporters in Vietnam, *Commerce needed data pertaining to USD inflows to Vietnam by exporters*, i.e., companies that sell goods internationally."  *Id.* (emphasis supplied).  During the investigation, Commerce requested this information from the GOV in the initial questionnaire, but the GOV responded with only "data on 'net commodity trade.'"  *Id.* (quoting GOV Initial Questionnaire Response (Aug. 25, 2020), Ex. F-1 at 4, CR 51, 59, PR 166, 170).  The provided figure of "net commodity trade" comprised the USD value of Vietnamese goods exports minus Vietnamese goods imports, which "represented USD inflows *and* outflows, not solely USD inflows from companies that sell goods internationally."  *Id.*

---

[9] Section 1677e(a)(2)(A)-(B) allows Commerce to use facts otherwise available where an interested party "withholds information that has been requested by [Commerce]" or "failed to provide such information . . . in the form and manner requested."

Accordingly, Commerce issued to the GOV a supplemental questionnaire requesting that the GOV "explain how [data on net commodity trade] were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained." *Id.* (quoting GOV SQR3). However, in its response the GOV did not provide the figures that went into the "net commodity trade" data originally reported and did not report the original values for USD inflows from the traded goods sector. *Id.* Commerce in the Remand Results explained that by failing to provide the data underlying the "net commodity trade" figure, along with the total USD inflow from the traded goods sector, "the GOV withheld information that was requested of it[] within the meaning of [§ 1677e(a)(2)(A)]." *Id.* at 8-9.

Commerce then cited § 1677e(a)(2)(B) as an alternative source of statutory authority for Commerce's reliance on the IMF data in the place of the GOV's data provided in its questionnaire responses. *Id.* at 9. Commerce stated specifically that "despite Commerce's repeated requests for USD inflows from the traded goods sector, the GOV reported only 'net commodity trade,' without reporting the component values of this 'net' value." *Id.* Commerce concluded as a result that "the GOV did not provide the requested information 'in the form and manner' requested," thereby permitting Commerce to rely on facts otherwise available. *Id.*

Finally, Commerce specified in the Remand Results that it "did not apply [adverse facts available] pursuant to [§ 1677e(b)]" because Commerce "do[es] not find that the GOV failed to cooperate by not acting to the best of its ability in responding to [Commerce's] requests for information." *Id.* at 10. Commerce continued that it also did

not rely on § 1677e(c), which requires that Commerce corroborate from independent sources secondary information "to the extent practicable," because "Commerce did not rely on secondary information in making [its] specificity determination."  *Id.*

Consequently, Commerce provided in the Remand Results an adequate explanation of the statutory authority on which Commerce relied in using the IMF data for total USD inflows to Vietnam as a proxy for USD currency conversions.  For that reason, Commerce's Remand Results in this respect are in compliance with the Court's remand order.

**B.   The information that Commerce considered to be missing from the record as a result of the failure of the GOV to provide the requested data concerning total USD inflows**

The Court ordered that on remand Commerce provide a "clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the GOV to provide total USD inflows from the traded goods sector, the traded services sector and utilized FDI and inbound portfolio investment."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1353.

Commerce's explanation complies with the Court's remand order.

In the Remand Results, Commerce reiterated that "the GOV failed to provide total USD inflows from exporters, *i.e.*, enterprises that sell goods internationally within the meaning of 19 CFR [§] 351.502(c)."  Remand Results at 11.  Commerce elaborated that a figure for "total USD inflows from exporters was necessary for Commerce's specificity analysis because it constitutes the numerator in the *de facto* specificity analysis."  *Id.*

Commerce continued that a "similar problem existed with respect to the traded services sector" because the GOV "failed to provide total USD inflows from the traded

services sector, instead only providing dollar denominated values for 'net services.'" *Id.*

As a result of the GOV's omission, "information relating only to the value of the export of services (as opposed to the value of exports minus imports of services) was missing from the record." *Id.* Commerce explained further that it "needed the USD value for the export of services because the export of services is a source of USD into the Vietnamese economy, and therefore constituted part of the denominator in the *de facto* specificity analysis."[10] *Id.*

Accordingly, Commerce identified precisely the information that it considered missing from the record as a result of the GOV's failure to provide total USD inflows from the traded goods sector and the traded services sector.

### C. The reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis

As described above, during the investigation Commerce requested that the GOV provide USD inflows to Vietnam divided by sector. Instead of providing the requested information, the GOV provided the "total USD inflow in several categories including *net commodity trade*, One-way money transfers of the net private sector, FDI in Vietnam, PI in Vietnam and Net Foreign debt." GOV SQR3 at 1 (emphasis supplied) (internal quotations omitted).

---

[10] As to foreign direct investment and portfolio investment, Commerce explained in the Remand Results that "there was nothing substantial missing from the record as a result of the GOV's responses." Remand Results at 12. In fact, the USD values reported by the GOV in its questionnaire responses "were identical to the values in the IMF data and were used by Commerce in the denominator in its specificity analysis." *Id.*

In *Kumho I*, the Court ordered that on remand Commerce explain "the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis." 48 CIT at __, 741 F. Supp. 3d at 1353.

Commerce's explanation complies with the Court's remand order. As mentioned, in the GOV's questionnaire responses, the GOV reported only "net commodity trade" in response to Commerce's request for total USD inflow from the traded goods sector, which comprised the USD value of exports minus imports. The GOV, despite Commerce's repeated requests, did not report the critical value that Commerce required of *USD inflow from exports*. *See, e.g.*, GOV SQR3 at 3.

In the Remand Results, Commerce explained the reasons that the information that the GOV reported was not usable for Commerce's specificity analysis. Commerce stated that "total USD inflows from exporters was necessary for Commerce's specificity analysis because it constitutes the numerator in the *de facto* specificity analysis." Remand Results at 11. Commerce added based on its regulation at 19 C.F.R. § 351.528(a)(1) that "any potential benefit 'is conferred from the exchange of United States dollars for the currency of a country under review or investigation.'" *Id.* Accordingly, the currency undervaluation subsidy program benefits exporters not importers — i.e., "companies exchanging USD for VND, not companies exchanging VND for USD." *Id.* at 13. However, the GOV's "net commodity trade" figure — which comprised the USD value of *exports minus imports* — did not enable Commerce to derive the figure that Commerce had requested and needed for its analysis: the precise value of *USD inflows to Vietnam from exports. Id.* For that reason, Commerce "did not

use the 'net commodity trade' information provided by the GOV in its third supplemental questionnaire response."[11]  *Id.*

The GOV data as to the traded services sector were not usable for similar reasons.[12]  Namely, as with the GOV "net commodity trade" figure, the GOV reported a "net figure" for the value of the traded services sector in Vietnam; the GOV did not provide to Commerce the requested USD inflows from the export of services, which was the value that Commerce required and would have included in the denominator in its specificity analysis.[13]  *Id.* at 13-14; *see* GOV SQR3 at 3.

Finally, with respect to the last two figures that the GOV reported in the third supplemental response — "[n]et [o]ne-way money transfers of the private sector" and

---

[11] In the Remand Results, Commerce explained:  "Commerce asked the GOV to explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded good sector and the traded services sector along with a citation for where this info was obtained."  Remand Results at 5.  The GOV described the *source* of the net figures that it reported in the third supplemental response:  "Data regarding net commodity trade is calculated from the General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIT values of imported goods to FOB values."  GOV SQR3 at 2.  However, as described above, the GOV did not provide, inter alia, "all original values."  As a result, this information was still not responsive to the "fundamental question" that Commerce posed repeatedly to the GOV and that the GOV repeatedly failed to answer: the value of USD inflows from the traded goods sector.  Remand Results at 13.

[12] In any event, and as Commerce described in the Remand Results, the figure for the export of services that Commerce derived from the IMF data and included in the denominator for the specificity analysis was far larger than the figure that the GOV reported.  Remand Results at 14.  So, "if anything, Commerce's decision" to use the IMF data for the value of USD inflows from the export of services "benefited the GOV and KTV."  *Id.*

[13] As described above, the values in the IMF data for foreign direct investment and portfolio investment that Commerce included in the denominator for its specificity analysis were identical to the data that the GOV reported for those values.

"[n]et foreign debt" — Commerce satisfied this Court's remand order that Commerce

explain the reasons that these figures were not usable to perform the necessary

analysis. GOV SQR3 at 3. Commerce explained that, like the "net commodity trade"

and "net services" figures that the GOV reported, these final two categories of data were

also "net figures," and therefore not usable in Commerce's specificity analysis. *Id.* at

15.

Commerce summarized its reasoning for using the IMF data instead of the data

reported by the GOV:

> In short, Commerce did not use the six categories and figures reported by
> the GOV, except for FDI and PI, because the most important of those
> figures, covering the traded goods sector, was a net figure and not a figure
> representing total USD inflows from the export of goods. The IMF data, on
> the other hand, clearly provided USD inflows from the export of goods.
> Similarly, the IMF data provided USD inflows from the export of services,
> rather than a net figure as reported by the GOV. At this point, given that two
> of the most important elements in the specificity calculation came from the
> IMF data, it would have made little sense for Commerce to use the GOV-
> reported information for the remainder.

*Id.*[14]

In sum, the court concludes that Commerce's explanation of the reasons that the

GOV-provided information was not usable to perform the necessary analysis complies

with the Court's remand order.

---

[14] Indeed, in the Remand Results, Commerce set out what would have been the result of its predominant use calculation had Commerce actually relied on the information provided by the GOV in its third supplemental response. Remand Results at 16. Commerce explained that, even if it had used the GOV's values, the results of that calculation reveal that "the traded goods sector would still be the predominant user of the subsidy." *Id*. That is because, using the GOV's values, the traded goods sector would account for 74.86 percent of the USD inflows, while Commerce in the *Final Determination* concluded that the traded goods sector accounted for only 71.94 percent of the USD inflows. *Id*.

### D.    Commerce's "four channels" analysis

In the investigation, Commerce "estimated the total proportion of USD inflows" to Vietnam during the POI "through the following four major channels of exchange": (1) exports of goods, (2) exports of services, (3) various forms of portfolio and direct investment, and (4) earned income from abroad.  PDM at 23-24; IDM at 18-20; USD Inflow Calculation Mem.  Commerce then calculated that 71.94 percent of USD inflows into Vietnam during the POI came from exports of goods.[15]  USD Inflow Calculation Mem.  Commerce concluded on this basis that companies that sell goods internationally were the predominant users of the currency undervaluation subsidy.  IDM at 20.

In the Court's remand order, the Court directed that Commerce on remand "explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1353.

Commerce's explanation in the Remand Results complied with the Court's remand order.

In the Remand Results, Commerce explained that it derived its four channels analysis from the IMF data that Commerce placed on the record.  Remand Results at 17.  Commerce pointed to the USD Inflow Calculation Memorandum on the record, which detailed Commerce's methodology in utilizing the IMF data.  *Id.* at 17 n.64 (citing USD Inflow Calculation Mem.).  The IMF data detailed the balance of payments figures for Vietnam during 2019 and provided balance of payments line items for the following

---

[15] The percentage value of USD inflows of the remaining three channels of exchange was: export of services (8 percent); earned income from abroad (7 percent); and financial account liabilities (13 percent).  USD Inflow Calculation Mem.

values: (1) "Goods, credit (exports)," (2) "Services, credit (exports)," (3) "Primary income, credit," (4) "Secondary income, credit," (5) "Direct investment, liabilities," (6) "Portfolio investment, liabilities," and (7) "Other investment, liabilities."  Remand Results at 17 (quoting IMF/OECD Mem.).  For its first and second channels of exchange, Commerce tracked the IMF categories.  Commerce found the first channel to be exports of goods ("Goods, credit (exports)") and the second channel to be exports of services ("Services, credit (exports)").  *Id.*; USD Inflow Calculation Mem.  For its third channel, Commerce collapsed the three IMF investment categories — (5) ("direct"), (6) ("portfolio") and (7) ("other") — into a third channel.  USD Inflow Calculation Mem.  And, finally, for its fourth channel, Commerce collapsed the IMF remittance categories — (3) ("primary") and (4) ("secondary") — into a fourth channel.  USD Inflow Calculation Mem.  Commerce considered that these balance of payments data comprised the universe of USD inflows to Vietnam during the POI.

Commerce continued that the IMF "is a credible international institution that tracks and disseminates international monetary and financial data, broadly from data it collects directly from its member countries, which in this case includes Vietnam."  Remand Results at 17.  Commerce explained that "the IMF data used by Commerce was originally reported to the IMF by the State Bank of Vietnam."  *Id.*  As a consequence, Commerce stated that it "appropriately can rely on such data and regularly relies on it in other contexts."  *Id.*

In sum, Commerce's explanation on the above four points is in compliance with the Court's remand order.

### E.   Commerce's finding that the traded goods sector was the "predominant user" of the currency undervaluation subsidy program

In *Kumho I*, the Court discussed and addressed plaintiff's various objections to Commerce's specificity analysis.  One of plaintiff's arguments was that Commerce's calculation of the usage of the currency undervaluation subsidy by exporters as a group and relative to all USD currency conversions in Vietnam was "based on the assumption that use is spread relatively evenly throughout various sectors of the economy."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1329.  The Court "[did] not understand the relevance of the point" raised by plaintiff and observed that Commerce in the *Final Determination* explained that "information on the record demonstrated that Commerce's finding that the currency program is *de facto* specific was not due merely to the lack of economic diversification in Vietnam."  *Id.*  Nevertheless, the Court remanded "so that Commerce may ensure to address KTV's argument fully," and instructed Commerce "to specify whether [it] made the assumption in its determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector."  *Id.*

Plaintiff objects on two grounds to this aspect of the Remand Results.  The court addresses each in turn.

### 1.   Whether Commerce complied with the Court's remand instructions

Plaintiff argues first that Commerce in its Remand Results did not comply with the Court's instructions that Commerce specify whether it made the assumption that use of the currency undervaluation subsidy is spread evenly in the traded goods sector.  According to plaintiff, Commerce attempted in its Remand Results to "rewrite the Court's remand instructions" and "fail[ed] to address the issue raised by the Court's decision."  Comments of Kumho Tire (Vietnam) Co., Ltd. on Commerce's Remand Redetermination

("KTV Remand Comments") at 3, ECF No. 95. Plaintiff maintains that this failure, "by itself, requires a further remand." *Id.*

The court concludes that Commerce's Remand Results complied with this aspect of the Court's remand instructions.

Commerce addressed directly the Court's instruction that Commerce explain whether it assumed in its specificity analysis that the currency undervaluation subsidy is spread evenly in the traded goods sector. Commerce stated that it "made no assumption, one way or the other, whether the subsidy usage was spread evenly within the . . . group of companies that sell goods internationally," and that Commerce does not consider the question relevant under § 1677(5A)(D). Remand Results at 19. Rather, according to Commerce, "group" within the meaning of § 1677(5A)(D) is a "unitary whole, similar to an 'industry' or 'enterprise.'" *Id.* Commerce explained that:

> [t]he question under [§ 1677(5A)(D)] is not whether the subsidy is distributed or used evenly *within* the beneficiary group or industry or even enterprise, but rather whether it is distributed or used evenly *among* different groups or industries or enterprises. For example, if the question is whether the steel industry is a predominant user, or receives a disproportionately large amount of, a subsidy, it does not matter whether the subsidy is distributed evenly within the steel industry. Rather, what matters is whether the steel industry receives a predominant or disproportionate share compared to other industries. The same principle holds true for a "group." The issue is not the distribution of the subsidy within the group, but rather the distribution of the subsidy compared to other groups.

*Id.*

Further, as this Court affirmed in *Kumho I*, Commerce addressed plaintiff's arguments concerning the level of economic diversification in Vietnam. Commerce "described extensive information on the record" and found that "[t]he evidence on the record indicates that, for the purposes of [the] *de facto* specificity analysis, the Vietnamese economy is diversified." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1329;

PDM at 19.   Accordingly, Commerce stated the record "demonstrated that Commerce's finding that the currency program is *de facto* specific was not due merely to the lack of economic diversification in Vietnam."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1329 (citing PDM at 19).[16]

Accordingly, Commerce's Remand Results complied with this Court's order that on remand Commerce "specify whether Commerce made the assumption in its determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector."  *Id.*

### 2.    Commerce's designation of exporters as a group in the specificity analysis

Plaintiff asserts next that Commerce's interpretation of "group" in the Remand Results "would . . . render the statutory provisions concerning identification of *de facto*

---

[16] The CVD law requires that Commerce in conducting the *de facto* specificity inquiry "take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy."  19 U.S.C. 1677(5A)(D)(iii).  The Statement of Administrative Action ("SAA") elaborates that the question of economic diversification is to "serve to inform the application of, rather than supersede . . . [t]he enumerated specificity factors. . . .  Thus, for example, with respect to economic diversification, in determining whether the number of industries using a subsidy is small or large, Commerce could take account of the number of industries in the economy in question."  Uruguay Round Agreements Act ("URAA"), Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 931 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209; *see also* 19 U.S.C. § 3512(d) (stating that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application" of the URAA).  In the PDM, Commerce explained that Vietnam did not have just one or two industries, but rather had a diversified economy with agriculture, forestry and fishing, mining and quarrying, manufacturing, construction, retail trade, banking, real estate, transportation and storage, etc.  PDM at 19.  If Vietnam did not have a diversified economy, but rather had only one or two industries, it would have cast doubt on whether the currency undervaluation subsidy was *de facto* specific.  That is because in a non-diversified economy the benefit of a subsidy would naturally be concentrated in the one or two existing industries.  That was not the case here.  Vietnam's economy is diverse; nevertheless, the benefit is concentrated in the sector that sells goods internationally.

specificity meaningless" because, plaintiff maintains, "[i]t is always possible to define a 'group' of industries in a manner that will find the group to be the predominant user of a subsidy program." KTV Remand Comments at 4-5. Plaintiff posits that this Court "previously held that Commerce cannot use its discretion to define 'groups' so broadly as to render meaningless the statutory language concerning 'disproportionate' use of a subsidy program." *Id.* at 4-5 (citing *Hyundai Steel Co. v. United States*, 48 CIT __, 745 F. Supp. 3d 1345 (2024)). Plaintiff adds that to give meaning to the statutory language, "a finding of 'predominant use' must consider whether the 'predominance' arises from a discriminatory preference for one enterprise or industry over another rather than from the sheer size of the group." *Id.* at 5.

Commerce's decision in this case to treat companies that sell goods internationally as a "group" under § 1677(5A)(D) is in accordance with law.

To start, this Court addressed in its remand order plaintiff's opposition to Commerce's designation of companies that sell goods internationally as the group for specificity purposes. *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1332. The Court rejected plaintiff's arguments and explained that "[t]here is no limitation in the statute on the size of a 'group of . . . enterprises or industries,' nor is there a requirement that there be shared characteristics among such a group." *Id.* The Court discussed in detail plaintiff's opposition to this aspect of Commerce's finding before holding that "the traded goods sector is comprised of a 'group of . . . enterprises or industries' within the

meaning of § 1677(5A)(D)."[17]  *Id.* (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)); *see also id.* at __, 741 F. Supp. 3d at 1296, 1324-36 (examining in detail each of plaintiff's arguments and concluding that "Commerce had the authority to promulgate [§ 351.502(c)] and to apply it in this case"); *see* 19 C.F.R. § 351.502(c).

In addition, the SAA refutes plaintiff's apparent contention that companies that sell goods internationally comprise too large of a "group" to be used as the numerator in a predominant use analysis.  Instead, the SAA contemplated expressly that Commerce might reach a finding of specificity even where the number of users of the subsidy is "very large":

> [G]iven the purpose of the specificity test as a screening mechanism, the weight accorded to particular factors will vary from case to case.  For example, where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity. . . .  On the other hand, *where the number of users of a subsidy is very large*, the predominant use and disproportionality factors would have to be assessed.  Because the weight accorded to the individual *de facto* specificity factors is likely to differ from case to case, clause (iii) makes clear that Commerce shall find *de facto* specificity if one or more of the factors exists.

SAA at 931 (emphasis supplied).

Moreover, plaintiff's position is unpersuasive that Commerce has interpreted "group" such that "[i]t is always possible" to find that "group to be the predominant user of a subsidy program."  KTV Remand Comments at 4-5.  The question of whether a subsidy is specific is a fact-intensive inquiry and "will vary from case to case."  SAA at 931.  That maxim applies in full force to the methodology that Commerce employed

---

[17] The Court also agreed with Commerce that "enterprises that buy and sell goods internationally are 'an identifiable set of enterprises' that 'constitute a subset of all economic actors within a country.'"  *Kumho Tire (Vietnam) Co., Ltd. v. United States* ("*Kumho I*"), 48 CIT __, __, 741 F. Supp. 3d 1277, 1332 (2024) (quoting *Final Rule*, 85 Fed. Reg. at 6,039).

here.  "For example, if 10 years from now Vietnam's economy were to shift to become a predominant exporter of services, then Commerce's determination of a numerator in this case might well not meet the predominant user standard.  This example further illustrates that Commerce's formulation is fact dependent . . . ."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1328-29.[18]

In the instant case, Commerce did not define "group" such that the designated group would necessarily and in every instance constitute the predominant user of the currency undervaluation subsidy.  To the contrary, Commerce identified companies that sell goods internationally as the "group of enterprises or industries" whose USD currency inflows would be compared to the "total proportion of USD inflows" into

---

[18] Defendant-intervenor offers two other examples that illustrate further the error in plaintiff's reasoning:

> In one country, the traded goods sector may be very large compared to other sectors such as services.  In another country — such as an island nation that relies on tourism or a financial hub that relies on investment — the traded goods sector may not be large relative to other sources of foreign exchange.  Thus, defining a group of enterprises as the traded goods sector does not always mean that the "size" of the sector is large.  That will depend on the facts of each case.

Def.-Intervenor's Resp. to Pl.'s Comments on the Remand Redetermination at 2, ECF No. 99.

Vietnam during the POI.[19]  Remand Results at 18.  Under this fact-specific inquiry and in the context of the Vietnamese economy, Commerce found that this group accounted for 71.94 percent of those USD inflows to Vietnam.  *Id.* at 15.  As a consequence, Commerce concluded that the designated group *in this case* was the predominant user of the currency undervaluation subsidy.  *Id.*; *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) ("Determinations of disproportionality and dominant use are

---

[19] Plaintiff asserts that Commerce's identified group in the instant case is tantamount to identifying essentially all manufacturers as a group.  Oral Arg. Tr. at 23:2-16, ECF No. 109.  Plaintiff's assertion is incorrect.  As the Court noted in *Kumho I* and above, the traded goods sector is not equivalent to all manufacturers in Vietnam.  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1328-29.

Further, to assess whether the traded goods sector was a predominant user of the subsidy, Commerce did not compare manufacturing recipients of the subsidy to all recipients of the subsidy, but rather USD inflows from the export of goods against all USD inflows to Vietnam during the POI.  For example, a company that manufactures goods in Vietnam may receive USD inflows from not only the export of goods but also from FDI or the export of services.  Conversely, a company that manufactures goods in Vietnam may not receive *any* USD inflows from the export of goods.  Commerce's group captures only those enterprises or industries that receive USD inflows and then USD inflows only from the export of goods.

not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case.").[20]

Finally, plaintiff's reliance on *Hyundai Steel* is unavailing. The Court in *Hyundai Steel*, 48 CIT at __, 745 F. Supp. 3d at 1351-52, addressed a Commerce finding of *de facto* specificity based on the conclusion by Commerce under § 1677(5A)(D)(iii)(III) that the group of industries in that case received a *disproportionately large* amount of the electricity program subsidy. The Court did not consider whether Commerce had permissibly applied § 1677(5A)(D)(iii)(II), which pertains to whether an identified group of enterprises or industries was the *predominant user* of a subsidy. *See id.* Indeed, in its remand decision, the *Hyundai Steel* Court declined to opine as to whether Commerce's group in that case and finding of *de facto* specificity would be reasonable under a predominant use analysis. *Hyundai Steel Co. v. United States*, 49 CIT __ n.9, Slip Op. 25-102, at *12 n.9 (Aug. 12, 2025) ("Even assuming that Defendant-

---

[20] At oral argument, plaintiff argued also that Commerce's specificity analysis was "incoherent" because many holders of USD may benefit from currency undervaluation even if they do not convert USD to VND, which, plaintiff maintains, Commerce's approach "ignor[es]." Oral Arg. Tr. at 37:8-38:8, 39:14-40:3 ("If I'm the hypothetical investor holding $1,000 in a U.S. bank, I'm richer as a result of this."); *see id.* at 41:13. However, to apply the CVD statute to the currency undervaluation subsidy, as to *any* potentially countervailable subsidy, Commerce is required to find that the subsidy "provide[d] a financial contribution," such as "a direct transfer of funds." 19 U.S.C. § 1677(5)(B)(i). Commerce concluded, and this Court affirmed, that plaintiff's "*exchanges of currency* constitute financial contributions." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1324 (emphasis supplied) (quoting IDM at 16). The statute does not direct either Commerce or this court to address whether plaintiff's hypothetical holder of "$1,000 in a U.S. bank" may be "richer" as a result of the GOV's currency undervaluation subsidy program. The court does not consider relevant under the statute such potential second order effects raised by plaintiff. Rather, the statute sets forth clearly that Commerce must find that the three core elements — financial contribution, benefit and specificity — are met for a subsidy to be countervailable.

Intervenor's point concerning relative consumption were apt with respect to predominance, it would not be apt for disproportionality.").[21]

In sum, the court concludes that Commerce's decision to treat companies that sell goods internationally as a "group," and Commerce's finding that the group was a predominant user of the currency undervaluation subsidy, are supported by substantial evidence and are in accordance with law.

## II. Commerce's explanation in its benefit analysis of the discrepancy between the two Treasury reports in the record

The Treasury Report on which Commerce relied in the investigation for its benefit analysis estimated that the GOV — through the State Bank of Vietnam — "undertook net purchases of foreign exchange in 2019 totaling $22 billion." Treasury Report at 1. According to Treasury, these net purchases "had the effect of undervaluing Vietnam's REER by 4.2%." *Id.* at 2. By contrast, Treasury's January 2020 Report to Congress stated: "[T]he Vietnamese authorities have credibly conveyed to Treasury that net purchases of foreign exchange were 0.8 percent of GDP over the four quarters through June 2019." January 2020 Report at 37.[22] Plaintiff observed in its brief in support of its

---

[21] Further, Commerce in *Hyundai Steel* combined the steel industry with three other industries to reach its finding of disproportionality. The Court found that Commerce failed to provide "a rational basis for the grouping." *Hyundai Steel Co. v. United States*, 48 CIT __, __, 745 F. Supp. 3d 1345, 1353 (2024). However, as mentioned, the Court's rejection of Commerce's group came in the context of Commerce's disproportionality analysis, not predominant use. *Id.* Moreover, by contrast to *Hyundai Steel*, in this case the traded goods sector was a rationally limited and clearly defined group. The sector represents an identifiable "subset of all economic actors within" Vietnam. *Final Rule*, 85 Fed. Reg. 6,039. And unlike in *Hyundai Steel*, in this case, Commerce determined as its group a certain segment of the Vietnamese economy and found that that segment was the predominant user. *Cf. id.*

[22] The full name of the January 2020 Report is "Report to Congress: Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States."

motion for judgment on the agency record that the figure in the January 2020 Report equates to "roughly $2.1 billion." Pl. Br. at 33 n.87.

In *Kumho I*, the Court ordered that Commerce "provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report and the Treasury's January 2020 Report." 48 CIT at __, 741 F. Supp. 3d at 1353; *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("A reviewing court must consider the record as a whole, including that which 'fairly detracts from its weight,' to determine whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

Commerce's explanation of the difference between the two reports complies with the Court's remand order and is supported by substantial evidence.

In the Remand Results, Commerce explained that "the discrepancy in the net foreign exchange transactions is largely attributable to inconsistent time periods between the Reports" in that the Treasury Report to Commerce covers specifically the 2019 POI (January through December 2019) while the January 2020 Report covers only "the first six months of the relevant POI . . . as well as the six months prior to the POI." Remand Results at 21. Commerce cites the following passage from the January 2020 Report to support Commerce's position that the six-month non-overlapping period accounts for the difference in net foreign currency purchases:

> Vietnam intervened in both directions over the course of these four quarters. The authorities sold foreign exchange over the second half of 2018 as financial turbulence in a few large emerging markets led to a pullback from other small emerging markets and created downward pressure on many emerging market currencies, including the dong. *As global financial conditions eased and holiday-related remittances increased in early 2019,*

> *the authorities shifted to purchasing foreign exchange, with net purchases over the first half of 2019 modestly outweighing net foreign exchanges over the prior six months.*

*Id.* at 22 (emphasis supplied) (quoting January 2020 Report at 37).

Commerce cited as another factor contributing to the difference that "the majority of Vietnam's foreign exchange purchases during the 2019 POI occurred in the latter half of 2019" — according to the IMF data in the record — which the January 2020 Report "did not take . . . into account." *Id.* For that reason also, the Treasury Report, which concerned the 2019 POI, calculated significantly higher net purchases of foreign exchange than the January 2020 Report. *Id.* Indeed, at oral argument, defendant noted that the IMF data concerning GOV foreign currency reserves during the POI approximates closely the net purchases of foreign exchange documented in the Treasury Report. Oral Arg. Tr. at 45:19-24; Department Memorandum to File: IMF Data (Jan. 8, 2025), PRR 5 (showing reserves during 2019 of $23.26 billion); Treasury Report at 1 (reporting that the GOV made $22 billion in net purchases of foreign exchange during the POI).[23] Accordingly, Commerce has addressed fully the difference between the two reports in net purchases of foreign exchange. *See Canadian Solar Int'l Ltd. v. United States*, 43 CIT __, __, 378 F. Supp. 3d 1292, 1305 (2019) (stating that substantial evidence requires "Commerce to address evidence that supports its finding as well as that which 'fairly detracts from its weight'" (quoting *Universal Camera Corp.*, 340 U.S. at 477-78)).

---

[23] The data from the IMF providing the GOV's balance of payments supports Commerce's analysis, showing that GOV's "reserves" in millions of USD for 2018 equated to $6,035.2, while "reserves" for 2019 equated to $23,257.9. Department Memorandum to File: IMF Data.

Plaintiff objects to the manner in which Commerce characterizes the decision of the GOV to increase significantly its purchases of foreign exchange. KTV Remand Comments at 5-7. Plaintiff points specifically to Commerce's statement that the "sharp increase in net purchases of foreign reserves in the second half of 2019 is likely attributable to the GOV's efforts to depreciate the VND vis-à-vis the USD during the period leading up to and including the holiday season in the United States, the largest consumer market for its goods" because, "[a]fter all, a devalued VND will help make Vietnamese goods cheaper on U.S. markets, and therefore more competitive." Remand Results at 22-23; KTV Remand Comments at 6-7. According to plaintiff, this statement by Commerce is "not supported by substantial evidence and is contradicted by the record" because "there is no evidence to support Commerce's allegation that the GOV manipulated the VND's value in late 2019 to benefit Vietnamese exporters to the United States." KTV Remand Comments at 6-7.

Plaintiff's assertion is not accurate. On the contrary, the record supports Commerce's position that the GOV increased vastly its foreign currency reserves in the third and fourth quarters of 2019, reflecting the significant increase in net foreign exchange purchases and explaining the significant difference between the two reports. For example, the IMF balance of payments table on the record shows a substantial increase in foreign currency reserves from the second quarter to the third quarter of 2019, after which the GOV nearly doubled its foreign currency reserves from the third

quarter to the fourth quarter of 2019.[24]  Department Memorandum to File: IMF Data.

Accordingly, Commerce's assertion in the Remand Results that the GOV's "foreign

exchange purchasing behavior changed significantly from 2018 to 2019, including in the

final two quarters of 2019," is supported by substantial evidence on the record.[25]

Remand Results at 26.

In sum, Commerce's explanation in the Remand Results of the difference

between the two Treasury reports on the record in net purchases of foreign exchange

complies with the Court's remand order and is supported by substantial evidence.

**CONCLUSION**

For the reasons described above, Commerce's Remand Results are sustained.

Judgment will enter accordingly.

/s/    Timothy M. Reif

Timothy M. Reif, Judge

Dated: August 22, 2025

New York, New York

---

[24] The IMF data provide the following for the GOV's reserves in millions of USD: 2019Q2, $1,929.8; 2019Q3, $4,853.2; 2019Q4, $9,259.9.  Department Memorandum to File: IMF Data.

[25] As the court has stated, Commerce's explanation of the difference in net purchases of foreign exchange is based on data in the record reflecting Vietnamese foreign exchange purchasing behavior.  In reaching this conclusion, the court does not consider Commerce's unwelcome speculation as to the role the "holiday season" may have played in the GOV's decision to increase substantially its foreign exchange purchases in the second half of 2019.